# EXHIBIT A

# EXHIBIT A

Electronically Filed
10/27/2015 12:20:45 PM

*[signature]*

**CLERK OF THE COURT**

**COMPB**
MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 009634
BRIAN E. LUNT, ESQ.
Nevada Bar No. 011189
MUCKLEROY LUNT, LLC
6077 S. Fort Apache, Ste 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Direct: (702) 534-6272
Fax: (702) 938-4065
martin@muckleroylunt.com
brian@muckleroylunt.com

*Liaison Counsel for Plaintiff*

**EIGHTH JUDICIAL JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

**IN AND FOR THE COUNTY OF CLARK**

| | |
|---|---|
| BRIAN D. GARTNER, derivatively on behalf of MUSCLEPHARM CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BRAD PYATT, LAWRENCE S. MEER, DONALD W. PROSSER, RICHARD ESTALELLA, JEREMY R. DELUCA, MICHAEL J. DORON, CORY GREGORY, L. GARY DAVIS, JAMES J. GREENWELL, JOHN H. BLUHER, and DANIEL J. MCCLORY, <br><br> Defendants, <br><br> and <br><br> MUSCLEPHARM CORPORATION, <br><br> Nominal Defendant. | Case No.: A- 1 5- 7 2 6 8 1 0- B <br><br> Dept. No.: XXVI I <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1   Plaintiff Brian D. Gartner ("Plaintiff"), by his undersigned attorneys, derivatively and on

2   behalf of Nominal Defendant MusclePharm Corporation ("MusclePharm" or the "Company"),

3   files this Verified Shareholder Derivative Complaint against defendants Brad Pyatt, Lawrence S.

4   Meer, Donald W. Prosser, Richard Estalella, Jeremy R. DeLuca, Michael J. Doron, Cory

5   Gregory, L. Gary Davis, James J. Greenwell, John H. Bluher, and Daniel J. McClory

6   (collectively, the "Individual Defendants")[1] for breaches of their fiduciary duties as members of

7   the Board of Directors (the "Board") and/or executive officers of MusclePharm.    Plaintiff

8   alleges the following based upon personal knowledge as to himself and his own acts, and

9   information and belief as to all other matters, based upon, *inter alia,* the investigation

10  conducted by and through his attorneys, which includes, among other things, a review of public

11  documents, conference calls and announcements, United States Securities and Exchange

12  Commission ("SEC") filings, press releases published by and regarding MusclePharm, news

13  reports, and securities analysts' reports and advisories about the Company.

14  ## <u>NATURE OF THE ACTION</u>

15      1.      This is a shareholder derivative action brought on behalf of nominal defendant

16  MusclePharm, against the Individual Defendants seeking to remedy the Individual Defendants'

17  breaches of fiduciary duties and other violations of law.

18      2.      The Individual Defendants breached their fiduciary duties by causing the

19  Company to engage in a series of accounting and disclosure failures that resulted in the

20  Company filing materially false and misleading filings with the SEC from 2010 through July

21  2014.    Specifically, as described further below, MusclePharm failed to disclose, among other

22  things, perquisite compensation to its executive officers, related party transactions, bankruptcies

23  related to two of its executive officers, and committed other financial statement, accounting, and

24  disclosure failures.    Consequently, the Individual Defendants repeatedly made false and

25  misleading statements to the investing public and Company shareholders.

26  _____
[1] The Individual Defendants and MusclePharm are sometimes referred to collectively herein as
27  "Defendants."

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

3.     As a result of the Individual Defendants' breaches of fiduciary duty, the Company was subjected to an internal investigation regarding the misconduct complained of herein, an SEC investigation, and civil penalties of $700,000.

4.     In addition, certain of the Individual Defendants as described below have breached their fiduciary duties to the Company by unilaterally adopting an invalid, unenforceable and unreasonable forum selection bylaw designating courts within the state of New York as the exclusive forum for disputes involving, among other things, claims for breaches of fiduciary duty.

5.     MusclePharm is incorporated in the state of Nevada and maintains its headquarters in the state of Colorado. The misconduct alleged herein emanates from the states of Colorado and Nevada and gives rise to claims under Nevada law. Upon information and belief, there are no sufficient contacts with the state of New York sufficient to confer jurisdiction over this action with a New York court.

6.     Plaintiff brings this action against the Individual Defendants to remedy their breaches of fiduciary duty.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action because the Company is incorporated in the State of Nevada.

8.     The claims asserted herein are governed by the laws of the State of Nevada. The State of Nevada has a distinct nexus with the alleged harm and the Defendants.

9.     Venue is proper in this Court pursuant to Nevada Revised Statutes § 13.040 because MusclePharm is incorporated in the State of Nevada and the conduct at issue had effect in this County.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**PARTIES**

10.     Plaintiff is a current shareholder of MusclePharm and has been a shareholder since June of 2012.   Plaintiff has continuously held MusclePharm common stock at all relevant times.

11.     MusclePharm is a Nevada Corporation with its principal place of business located in Denver, Colorado.   The Company develops, manufactures, and markets sports nutrition products.

12.     Defendant Brad Pyatt ("Pyatt") is the Company's Chief Executive Officer ("CEO") and a Director.   He co-founded the Company in April 2008.   According to MusclePharm's website, Pyatt's background includes seven years of experience as a professional athlete, and five years of experience in the sports nutrition arena.   Pyatt reportedly studied "kinesiology exercise science" at the University of Kentucky.   According to the SEC, Pyatt "lacked public company or accounting experience and failed to hire executives with the required expertise."   *See* Cease-and-Desist Order *In the Matter of Brad J. Pyatt*, SEC Administrative Proceeding, File No. 3-16789.  He also "failed to ensure sufficient internal controls were enacted and proper books and records were kept" and "failed to educate himself regarding the required reporting of executive compensation in the Commission filings or what were considered perquisites with respect to executive officers." *Id.*

13.     Defendant Cory Gregory ("Gregory") is the co-founder of MusclePharm and has served as a named executive officer since the Company's inception in 2008 and is MusclePharm's Executive Vice President of Brand Awareness and Social Media.   Prior to co-founding MusclePharm, Gregory worked as an underground coal miner, operated a gym and participated in numerous powerlifting competitions.   Gregory has an "Exercise Specialist Certificate" from Columbus State College.

14.     Defendant L. Gary Davis ("Davis") served as Chief Financial Officer ("CFO") of MusclePharm from July 2012 until April 2014.   He continued to be employed by MusclePharm

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

in a special projects role until December 31, 2014.  Davis is a certified public accountant and reportedly earned a bachelor's degree in accounting from Boise State University and is several credits short of a master's degree in finance from the Rochester Institute of Technology.  Prior to joining MusclePharm, from 2004 to 2010, Davis served as Executive Vice President and CFO of Bodybuilding.com.  In 2012, Bodybuilding.com, LLC pled guilty to misdemeanor counts of introduction and delivery for introduction of misbranded drugs into interstate commerce in violation of the Food, Drug and Cosmetic Act and agreed to pay a $7 million fine.  According to the plea agreements, between 2006 and 2009, Bodybuilding.com, LLC sold drugs containing synthetic anabolic steroids or synthetic chemical "clones" of anabolic steroids.  Pyatt touted Davis's "[d]eep knowledge of the dietary supplement industry and long association with MusclePharm products" as reasons he would be an ideal fit to serve as CFO of the Company.  Given his involvement in the misconduct described herein, Davis has been suspended from practicing as an accountant on behalf of any SEC-regulated entitles with a right to reapply after two years.

15.    Defendant Richard Estalella ("Estalella") has served as the Company's President since April 2014.  He was the Company's Chief Operating Officer ("COO") from April 2013 to April 2014, and a member of the Board since August 2013.  Estalella is currently a member of the Company's Strategic Initiatives Committee.  Prior to joining MusclePharm, Estalella worked at Office Depot from 1987 to 1998, serving in many capacities, beginning as an assistant store manager in Miami, Florida and later named Senior Vice President of Warehouse Operations in 1997, which position he served in until 1998.  Commenting on Estalella joining Pyatt stated, "Given my background as a former NFL player, I would characterize Richard as an enormous, game-changing free agent addition to the MusclePharm team."

16.    Defendant Jeremy R. DeLuca ("DeLuca") joined the Company as Senior Vice President and Chief Marketing Officer ("CMO") in November 2010.  Effective August 6, 2013, DeLuca is no longer a named executive officer of the Company and his title was changed from

Executive Vice President and CMO to President of Sales and Marketing.  He continues to be employed as Executive Vice President of MusclePharm Brand and Business Development.  Prior to joining the Company, from April 1999 to November 2010, DeLuca served as the President of Bodybuilding.com, an online sports nutrition and supplements company, which he co-founded in 1999. There, DeLuca was actively involved in all aspects of Bodybuilding.com's business, with a focus on marketing, sales, and e-commerce. As noted above, in 2012, Bodybuilding.com, LLC pled guilty to misdemeanor counts of introduction and delivery for introduction of misbranded drugs into interstate commerce in violation of the Food, Drug and Cosmetic Act and agreed to pay a $7 million fine.  In August 2012, DeLuca was fined $600,000 by the FDA in connection with the plea agreement on six misdemeanor counts and DeLuca agreed to serve three years of probation.

17.     Defendant James J. Greenwell ("Greenwell") served as a director on MusclePharm's Board from October 2012 until May 2014.  He has served as MusclePharm's COO since May 2014.  Greenwell served as Vice President, Voice Products for Intelligrated, Chairman and CEO of Datria Systems and Senior Vice President, Sales and Marketing for DecisionOne. Previously, he served as a technology executive in a number of private and public companies.

18.     Defendant Michael J. Doron ("Doron") has served as a director on MusclePharm's Board since November 5, 2012, and Lead Director of the Board since May 21, 2015.  Doron is currently a member of the Company's Audit Committee, its Governance and Nominating Committee and its Strategic Initiatives Committee.  He has been the Managing Director of DDR & Associates, LLC since January 2009, and Evolution Capital Partners, LLC since October 2009. From January 2007 to December 2008, he served as COO and director of Toyshare, Inc. From February 2006 to January 2007, Doron served as COO and CFO of Frontgate Sundance Alliance. From September 2005 to January 2007, he served as Vice President - Private Banking of the Bank of the West.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

19.     Defendant Lawrence S. Meer ("Meer") served as the CFO of MusclePharm from June 2010 to July 3, 2012 and served as its Principal Accounting Officer.  Prior to CFO, he was the Director of Finance at MusclePharm, LLC from October 2009 to July 2010. His other past experience includes daily cash management and treasury functions, including the establishment of credit and collection procedures to maximize cash flow, reduce corporate debt and enhance shareholder value. He previously served as President and CFO at Color It Textile, Inc., a textile finishing business, from March 2002 to December 2008. He was also held the positions of treasurer, director and vice president at Englewood Asset Management, Inc. and director at Cit Merchandising, Inc.   Based on information and belief, all three of these entities filed for bankruptcy protection.  Given his involvement in the misconduct described herein, Meer has been suspended from practicing as an accountant on behalf of any SEC-regulated entitles with a right to reapply after three years.

20.     Defendant John H. Bluher ("Bluher") served as the Company's Executive Vice President - COO from September 2011 until he resigned from the position on October 17, 2013. He also served as Co-Chairman of the Board from July 2012 until December 31, 2013. From February 2011 to August 2012, he served on the board of directors of Targeted Medical Pharma, Inc. and from August 2010 to September 2011, he was managing director of AFH Holdings & Advisory LLC, a business consulting company.

21.     Defendant Donald W. Prosser ("Prosser") served as a director on MusclePharm's Board from July 2012 until April 2014.  In April 2014 he became CFO of MusclePharm and held that position until his resignation in March 2015.  Prosser has been the principal executive officer and principal financial officer of Arête Industries, Inc. since January 2011 and a director of Arête since September, 2003.  Prosser owns a certified public accounting firm, Donald W. Prosser, P.C., specializing in tax services and accounting and has represented a number of private and public companies serving in the capacity of accountant, member of boards of directors, and as chief financial officer.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

22.     Defendant Daniel J. McClory ("McClory") served as a director of MusclePharm from August 6, 2013 to May 21, 2015.  He leads the China Practice at Burnham Securities Inc. ("Burnham") and serves as Head of West Coast Investment Banking in Los Angeles. Prior to Burnham he was Head of Equity Capital Markets at Hunter Wise Financial Group, LLC for ten years.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

25.     To discharge their duties, the officers and directors of MusclePharm were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of MusclePharm were required to, among other things:

      a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and disseminating truthful and accurate statements to the SEC and the investing public;

b.  conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.  ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

26.  In addition, the Company's Nominating and Corporate Governance Charter dated July 24, 2012, vested the members of that committee with additional powers and duties, including the duty to ensure that the Board is composed of individuals with "relevant career experience, relevant technical skills, industry knowledge and experience, [and] financial expertise (including expertise that could qualify a director as an 'audit committee financial expert,' as that term is defined by the rules of the Securities and Exchange Commission...").

27.  The Company's Audit Committee Charter dated July 24, 2012, also created duties and responsibilities for its members, including, the duty to oversee the integrity of MusclePharm's financial reporting process and systems of internal controls regarding finance, accounting, and legal and ethical compliance.

28.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the

9

1   absence of good faith on their part, and a reckless disregard for their duties to the Company and

2   its shareholders that the Individual Defendants were aware or should have been aware posed a

3   risk of serious injury to the Company.

4                                   **FACTUAL ALLEGATIONS**

5     29. MusclePharm is a Nevada corporation, based in Denver, Colorado, that

6   manufactures and markets sports nutrition products.  From 2010 to present, MusclePharm's

7   common stock was registered with the SEC pursuant to Section 12(g) of the Exchange Act and

8   was quoted on the OTC Bulletin Board.

9   **A. The Individual Defendants' Failure to Disclose Executive Compensation**

10  **  Perks from 2010 through July 2014[2]**

11    30. From 2010 through July 2014, the Individual Defendants who served as directors

12  and executive officers during that time caused MusclePharm to file false and misleading

13  statements with the SEC that significantly understated its disclosed executive compensation

14  benefits by approximately $482,000 or 76% in Forms 10-K, Forms S-1, and proxy statements.

15  MusclePharm understated its disclosed executive compensation perks: (1) in 2010 by

16  approximately $37,000 or 100%; (2) in 2011 by approximately $160,000 or 100%; (3) in 2012

17  by approximately $214,000 or 93%; and (4) in 2013 by approximately $71,000 or 35%.

18    31. MusclePharm paid defendant Pyatt approximately $244,000 of undisclosed perks

19  from 2010 through 2013.  The perquisites were related to meals, autos, apparel, personal and

20  professional tax and legal services, and two golf club memberships.

21

22

23  _____

24  [2] *See* Cease-and-Desist Order *In the Matter of MusclePharm Corporation*, SEC Administrative Proceeding, File No. 3-16788; Cease-and-Desist Order *In the Matter of Brad J. Pyatt*, SEC Administrative Proceeding, File No. 3-16789; Cease-and-Desist Order *In the Matter of Lawrence*

25  *S. Meer, CPA*, SEC Administrative Proceeding, File No. 3-16790; Cease-and-Desist Order *In the Matter of L. Gary Davis, CPA*, SEC Administrative Proceeding, File No. 3-16791; Cease-and-

26  Desist Order *In the Matter of Donald W. Prosser, CPA*, SEC Administrative Proceeding, File

27  No. 3-16792 (Collectively the "Cease-and-Desist Orders").

             10

28

32.     During this same time period, MusclePharm also paid for benefits of other executives that were not disclosed, including items such as the medical costs of the birth of a child, eye surgery, and personal golf club memberships.

33.     From 2010 until mid-2012, defendants Pyatt, Gregory, Meer, Bluher and DeLuca knew or recklessly disregarded that complete and accurate executive compensation information was required to be disclosed in SEC filings.  As a consequence, MusclePharm did not disclose any perquisites in its filings with the SEC prior to October 2012.

34.     From mid-2012 through 2013, defendants Pyatt, Prosser, Bluher, Doron, Greenwell, McClory, DeLuca, Estalella, Davis and Gregory failed to properly identify or fully investigate the undisclosed benefits.  As a consequence, MusclePharm continued to fail to identify or disclose many perquisites in its filings with the SEC through July 2014.

35.     Finally, MusclePharm's executive compensation disclosure practices caught the attention of the SEC and the Company announced that it was given a formal order of investigation by the SEC in September 2013.  Due to the SEC's investigation, MusclePharm was forced to initiate an internal review to determine the amount of undisclosed perks paid by MusclePharm to its executives since 2010.  This internal review was undertaken by the Audit Committee, which at the time was composed of defendants Prosser, Greenwell and Doron.  MusclePharm identified over $100,000 of undisclosed perquisites, including jet use, autos, and golf club memberships. Even with the information obtained through the Audit Committee's investigation, these defendants caused MusclePharm to file a false and misleading Form S-1 in August 2013 that contained incorrect perquisite disclosures that were identical to amounts previously disclosed before the internal review began.

36.     MusclePharm continued its internal investigation of undisclosed perquisites from fall 2013 through spring 2014.  On March 31, 2014, defendants Pyatt, Davis, Estalella, Doron, Greenwell, McClory and Prosser caused MusclePharm to file its 2013 Form 10-K.  In the summary compensation table, the 10-K set forth for the first time previously undisclosed

perquisites for 2011 and 2012 totaling approximately $189,000 (previously undisclosed perquisites of $74,000 for 2011 and $115,000 for 2012). The table also disclosed approximately $134,000 of perquisites in 2013. Notably, however, these disclosures, still significantly understated perquisites paid to MusclePharm executives.

37.     MusclePharm reexamined its executive compensation benefits investigation results from spring 2014 through fall 2014. On October 31, 2014, MusclePharm filed amended Forms 10-K for the years ended 2012 and 2013. The 2013 Form 10-K/A disclosed an additional $252,000 of undisclosed perquisites that were not included in the 2013 Form 10-K or its July 2014 proxy statement. The 2012 Form 10-K/A disclosed an additional $37,000 of perquisites for 2010. In total, MSLP failed to report perks totaling approximately $482,000 from 2010-2013.

38.     According to the Cease and Desist Orders issued by the SEC, MusclePharm's Board of Directors and members of senior management had reason to know since at least since September 2012 that MusclePharm had not disclosed certain perquisite compensation paid to its executive officers. Nevertheless, these individuals caused or allowed the Company to make filings with the SEC that materially understated perquisite compensation.

**B.     The Individual Defendants' Failure to Disclose Related Party Transactions with a Major Customer from 2011 through 2012**

39.     Defendants Pyatt, Gregory, DeLuca, Meer, Davis, Greenwell, Doron, Bluher and Prosser knew or should have known that policies regarding identifying and disclosing related party transactions were required and yet they failed to implement sufficient policies regarding identifying and disclosing related party transactions. As a result, from May 2011 through 2012, at the direction of those defendants, MusclePharm failed to disclose in SEC filings significant related party transactions with a major customer.

40.     On May 25, 2011, the Board of MusclePharm appointed defendant DeLuca as the Company's new President and CMO. DeLuca was a former executive and co-founder of a major customer of MusclePharm, Bodybuilding.com. DeLuca's brother was the CEO of

Bodybuilding.com, MusclePharm's major customer, and had a greater than 10% ownership of Bodybuilding.com. From May 2011 to April 2012, at the direction of defendants Pyatt, Gregory, DeLuca, Meer and Bluher, MusclePharm did not identify this related party relationship or consider if disclosure was necessary.

41.     In fact, the 8-K filed by MusclePharm with the SEC announcing DeLuca's hiring, and signed by Defendant Pyatt, specifically stated:

### *Appointment of President and Chief Marketing Officer*

On May 25, 2011, the board of directors of MusclePharm Corporation, a Nevada corporation (the "Company"), appointed Jeremy DeLuca as the Company's new President and Chief Marketing Officer. The relevant business experience of Mr. DeLuca is as follows:

### Jeremy DeLuca, age 32, President, Chief Marketing Officer

Mr. DeLuca is the Company's President and Chief Marketing Officer. Prior to joining the Company, from April 1999 to November 2010, Mr. DeLuca served as the President of Bodybuilding.com, an online sports nutrition and supplements company which he co-founded in 1999 ("Bodybuilding.com"). As President, Mr. DeLuca was actively involved in all aspects of Bodybuilding.com's business, with a focus on marketing, sales, and e-commerce. Mr. DeLuca's responsibilities also included managing all vendor relations, marketing strategies, sales promotions, store content and store site development. During Mr. DeLuca's tenure, Bodybuilding.com grew tremendously, achieving annual sales of over $200,000,000 in 2010.

### Family Relationships

Mr. DeLuca does not have a family relationship with any of the current officers or directors of the Company.

### Related Party Transactions

***There are no related party transactions reportable under Item 5.02 of Form 8-K and Item 404(a) of Regulation S-K.***

(Emphasis added).

42. In March 2012, MusclePharm's auditor informed the Company that transactions with Bodybuilding.com were related party transactions requiring disclosure. In April 2012, at the direction of defendants Pyatt, Gregory, DeLuca, Meer and Bluher, MusclePharm in an effort to keep these related party transactions hidden provided a memo to its auditors concluding that transactions with Bodybuilding.com did not require disclosure under generally accepted accounting principles ("GAAP"). To that end, the memo to the auditors contained inaccurate information about the relationship between MusclePharm, DeLuca, and Bodybuilding.com.

43. Three days after providing the memo to MusclePharm's auditors, defendants Pyatt, Gregory, DeLuca, Meer and Bluher caused MusclePharm to file its 2011 Form 10-K, without any related party disclosure regarding Bodybuilding.com.

44. On July 3, 2012, MusclePharm appointed Davis as its CFO. Davis had previously been CFO of Bodybuilding.com (where DeLuca's brother was CEO) and acquired a 1.75% indirect interest in Bodybuilding.com. Davis also continued to perform work for DeLuca's brother, the CEO of Bodybuilding.com, personally at no charge while he worked at MusclePharm.

45. In August 2012, MusclePharm's auditor requested that MusclePharm update the April 2012 memo to address whether Bodybuilding.com was a related party requiring disclosure under GAAP, specifically due to DeLuca's and/or Davis' employment. Again, the August memo concluded that transactions with the major customer did not require disclosure under GAAP as the memo contained inaccurate information about the relationship between MusclePharm, DeLuca, Davis, and Bodybuilding.com. As a result, defendants Pyatt, Gregory, DeLuca, Meer, Davis, Bluher, Doron, Greenwell and Prosser continued to cause MusclePharm to fail to disclose material transactions with Bodybuilding.com, a major customer of MusclePharm, as related party transactions in SEC filings until the filing of MusclePharm's Form 10-Q for the quarter ended March 30, 2013 in May 2013.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**C.      MucslePharm's Failure to Disclose Bankruptcies Related to Executive Officers from 2010-2012**

46.      Defendant Pyatt filed for personal bankruptcy in 2008 in the United States District Court for the District of Colorado.  Two companies owned by defendant Meer also filed for bankruptcy in 2008 in the United States District Court for the Southern District of Florida.  From April 2011 through July 2012, MusclePharm's filings, at the behest of defendants Pyatt, Gregory, DeLuca, Meer, Davis, Bluher and Prosser, did not include disclosure of Pyatt's bankruptcy.  MusclePharm also never disclosed the bankruptcies of Meer's former companies.  From April 2011 through October 2012, MusclePharm's filings, at the behest of defendants Pyatt, Gregory, DeLuca, Meer, Davis, Bluher and Prosser, also included a misstatement that "[n]one of the members other board of directors or other executives has been involved in any bankruptcy proceedings."

**D.      Other Financial Statement, Accounting, and Disclosure Failures from 2010-2013**

47.      Defendants Pyatt, Gregory, Meer, DeLuca and Bluher caused MusclePharm to improperly account for advertising and promotional related costs for 2010 and 2011.  Instead of accounting for advertising and promotional related costs as a reduction of revenue as required under GAAP, MusclePharm recorded these costs as advertising expenses resulting in the Company overstating revenue by $845,000 or 26% in 2010 and $3.6 million or 21% in 2011.  As a result, on July 2, 2012, MusclePharm filed an amended Form 10-K for the year ended December 31, 2011 restating its 2010 and 2011 financial statements.

48.      Defendants Pyatt, Gregory, Meer, DeLuca and Bluher additionally caused MusclePharm to record approximately $1.5 million of loss on settlement of accounts payable in the first quarter of 2011, when GAAP required it be disclosed in 2010.  By reporting the loss in the wrong quarter, MusclePharm understated its 2010 loss on settlement of accounts payable as presented on its income statement by 78% and overstated it by 455% in the first quarter of 2011.  MusclePharm's net loss was understated 8% in 2010 and overstated 42% in 2011.

15

49.     Defendants Pyatt, Gregory, Meer, DeLuca and Bluher caused MusclePharm to fail to disclose continuing sponsorship commitments in its Form 10-K for the year ended December 31, 2011 and its Forms S-1 filed during 2012 as required under GAAP.  The future sponsorship commitments required MusclePharm to make future payments totaling $6.9 million through 2013.

50.     Defendants Pyatt, Gregory, Meer, DeLuca, Davis and Bluher caused MusclePharm to fail to disclose that it had one supplier that accounted for nearly 100% of its product purchases in its 2011 and 2012 SEC filings as required under GAAP.

51.     Defendants Pyatt, Gregory, Meer, DeLuca, Davis and Bluher caused MusclePharm to fail to disclose $100,000 of rent expense related to an August 2012 aircraft lease agreement in its 2012 SEC filings as required under GAAP.  As a result, MSLP understated its disclosed rent expense by 23%.

52.     These defendants caused MusclePharm to fail to disclose the amount of its international sales in its 2011 through 2013 SEC filings as required under GAAP. MusclePharm's international sales accounted for 23%, 30% and 31% of its total sales for 2011, 2012, and 2013 respectively.

**E.      Retention of Signature Pages for SEC Filings**

53.     The directors and executive officers of MusclePharm during the 2010 to 2013 time period also caused MusclePharm to fail to maintain signed signature pages for most of its filings with the SEC from 2010 through 2013 as required under Rule 302 of Regulation S-T. MusclePharm failed to receive or maintain any manually signed signature pages prior to December 2012.  After December 2012, even though MusclePharm had made over 23 SEC filings, the Company received or maintained original signature pages for all signatories on only eight filings.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**F.      Books, Records, and Lack of Internal Controls**

54.      Because MusclePharm, at the behest of the Individual Defendants, improperly recorded and/or reported its perquisites, related parties, revenue, losses on settlement of accounts payable, sponsorship commitments, manufacturing concentration, leases, and international sales, its books, records and accounts did not, in reasonable detail, accurately and fairly reflect its transactions and dispositions of assets.

55.      In addition, the Individual Defendants failed to implement adequate internal accounting controls relating to its perquisites, related parties, revenue, losses on settlement of accounts payable, sponsorship commitments, manufacturing concentration, leases, and international sales, sufficient to provide reasonable assurances that its transactions were recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

**G.      The Individual Defendants Cause the Company to Issue False and Misleading Statements**

56.      The Form 10-K filed on April 1, 2011 for the fiscal year ending December 31, 2010 was signed by defendants Pyatt and Meer.  The Form 10-K filed on April 16, 2012 for the fiscal year ending December 31, 2011 was signed by defendants Pyatt, Gregory, Meer, DeLuca and Bluher.  The Form 10-K filed on April 1, 2013 for the fiscal year ending December 31, 2012 was signed by defendants Pyatt, Davis, Doron, Bluher, Greenwell and Prosser.  The Form 10-K filed on April 1, 2013 for the fiscal year ending December 31, 2012 was signed by defendants Pyatt, Davis, Doron, Bluher, Greenwell and Prosser.  The Form 10-K filed on March 31, 2014 for the fiscal year ending December 31, 2013 was signed by defendants Pyatt, Davis, Estalella, Doron, McClory, Greenwell and Prosser.   In each of these 10-Ks, the stated Individual Defendants caused MusclePharm to significantly understate its disclosed executive compensation benefits, in addition to the other false and misleading statements outlined above.

57.     The stated Individual Defendants also caused the Company to file false and misleading Form S-1s with the SEC, once again causing MusclePharm to significantly understate its disclosed executive compensation benefit, in addition to the other false and misleading statements outlined above.  The false and misleading Form S-1s were filed with the SEC on the following dates and signed by the identified defendants:

| Date of Form S-1 Filing | Individual Defendants who Signed the Form S-1 |
| --- | --- |
| September 9, 2011 | Pyatt, Gregory, Meer, DeLuca |
| December 9, 2011 | Pyatt, Gregory, Meer, DeLuca, Bluher |
| February 14, 2012 | Pyatt, Gregory, Meer, DeLuca, Bluher |
| October 26, 1012 | Pyatt, Davis, Bluher, Prosser, Greenwell |
| June 18, 2013 | Pyatt, Davis, DeLuca, Bluher |
| August 21, 2013 | Pyatt, Davis, Bluher, Gregory, Prosser, Doron, Greenwell, Estalella, McClory |

58.     Finally, on July 23, 2014, the Board, which included defendants Pyatt, Estalella, Doron and McClory caused the Company to file a proxy statement with the SEC which once again contained false and misleading statements regarding executive compensation benefits, even after an internal investigation was undertaken by the Board's Audit Committee.

59.     Each of the above mentioned Form 10-Ks' contained the following certifications executed by Defendant Pyatt:

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 302 OF**

18

## THE SARBANES-OXLEY ACT OF 2002

I, Brad J. Pyatt, certify that:

1.   I have reviewed this Form 10-K of MusclePharm Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods present in this report;

4.   Along with the Principal Accounting Officer, I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13-a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financing reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

19

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involved management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*\*\*

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906 OF
THE SARBANES-OXLEY ACT OF 2002**

In connection with this Annual Report of MusclePharm Corporation (the "Company"), on Form 10-K for the year ended December 31, 2010, as filed with the U.S. Securities and Exchange Commission on the date hereof, I, Brad J. Pyatt, Principal Executive Officer of the Company, certify to the best of my knowledge, pursuant to 18 U.S.C. Sec. 1350, as adopted pursuant to Sec. 906 of the Sarbanes-Oxley Act of 2002, that:

(1) Such Annual Report on Form 10-K for the year ended December 31, 2010, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in such Annual Report on Form 10-K for the year ended December 31, 2010, fairly presents, in all material respects, the financial condition and results of operations of the Company.

60.     In addition, the 10-Ks for April 1, 2011 and April 16, 2012 contained the same certifications executed by Defendant Meers, while the certifications for the April 1, 2013 and March 31, 2014 10-Ks also contained certifications executed by Defendant Davis.

61.     In each case, these certifications were knowingly false when signed by those defendants.

62.     As set forth in the Cease-and-Desist Orders, the directors and officers of Muscle Pharm between 2010 and 2014 failed to implement internal accounting controls relating to the Company's perquisites, related parties, revenue, leases, losses on settlement, sponsorship

20

commitments, manufacturing concentration, and international sales which were sufficient to provide reasonable assurances that transactions were recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

**H.      Certain of the Individual Defendants Cause the Company to Make Stock Issuances Without a Registration Statement**

63.      In 2011, MusclePharm lacked funds to pay approximately $1.1 million of outstanding invoices to creditors dating back to services and products purchased in 2009 and 2010.  To pay off the vendors, MusclePharm entered into numerous agreements, negotiated and signed by Pyatt, with third-parties who were willing to pay MusclePharm's vendors in cash in exchange for shares of MusclePharm stock that the third-parties immediately sold into the market after counsel representing MusclePharm opined to the transfer agent that the shares could be issued without a restrictive legend.  No registration statement was filed with the SEC for these transactions and no exemption from registration was available.

**I.      The Price Paid for the Individual Defendants' Breaches of Fiduciary Duty**

64.      On April 13, 2015, MusclePharm announced that it has reached an agreement in principle with the SEC to resolve its investigation.

65.      On September 8, 2015, MusclePharm settled the SEC's charges that the Company committed a series of accounting and disclosure violations, including the failure to properly report perks provided to its executives as compensation.

66.      MusclePharm Corporation agreed to settle the charges along with three current or former executives, defendants Pyatt, Davis, and Meer, and the Company's former audit committee chair, defendant Prosser, all of whom were found to have been involved in various aspects of the Company's misconduct.

67.      An SEC investigation found that MusclePharm omitted or understated nearly a half-million dollars' worth of perks bestowed upon its executives, including approximately

$244,000 paid to CEO Pyatt related to automobiles, apparel, meals, golf club memberships, and his personal tax and legal services. Even after the Company began an internal review of undisclosed executive perks and then-audit committee chair defendant Prosser became directly involved in the process, MusclePharm continued to file financial statements that failed to disclose private jet use, vehicles, and golf club memberships for its executives.

68.     "Executive compensation is material information for investors, and companies must ensure that perks it pays for executives are properly recorded and disclosed in public filings," said Andrew J. Ceresney ("Ceresney"), Director of the SEC's Division of Enforcement.

69.     Ceresney further stated "Prosser, MusclePharm's audit committee chair, subjected himself to liability when he substituted his wrong interpretation of SEC rules for the views of experts the company had hired, resulting in an incorrect disclosure."

70.     Among other accounting and disclosure violations outlined in the SEC's orders instituting settled administrative proceedings against MusclePharm, Prosser, Pyatt, and former chief financial officers L. Gary Davis and Lawrence Meer the SEC's investigation found:

- MusclePharm failed to disclose related party transactions with a major customer and failed to implement sufficient policies to identify and disclose related party transactions;

- MusclePharm failed to disclose bankruptcies related to two executive officers, and misstated that no members of the Board or other executives had been involved in any bankruptcy proceedings;

- MusclePharm improperly accounted for advertising and promotional related costs and consequently overstated its revenue;

- MusclePharm failed to disclose continuing sponsorship commitments for which the Company eventually made payments totaling $6.9 million;

- MusclePharm understated its rent expense by failing to disclose $100,000 related to an aircraft lease agreement; and

- MusclePharm failed to implement internal accounting controls for perks and other areas where it committed accounting and disclosure violations.

71.    In order to settle the SEC's charges, MusclePharm agreed to pay a $700,000 penalty and hire an independent monitor for one year among other undertakings.  Defendant Pyatt agreed to pay a $150,000 penalty, and Defendants Prosser and Davis each agreed to pay $30,000 penalties.  Defendants Meer and Davis agreed to be suspended from practicing as an accountant on behalf of any SEC-regulated entities with a right to reapply after three and two years, respectively.

72.    The SEC's investigation, however, is continuing in nature.

**I.    Defendants Pyatt, Estalella and Doron cause the Company to Adopt an Invalid, Unenforceable and Burdensome Forum Selection Provision**

73.    On May 8, 2015, defendants Pyatt, Estalella and Doron caused the Company's Board to unilaterally and inexplicably adopt an exclusive form bylaw provision requiring shareholder actions involving, among other things, claims for breach of fiduciary duty, to be brought in a state or federal court located within the state of New York:

> Section 5. Forum Selection. Unless the Corporation consents in writing to the selection of an alternative forum, a state or federal court located within the State of New York shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim for breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any actions asserting a claim arising pursuant to any provision of the Nevada Revised Statutes, the Articles of Incorporation or these Bylaws, in each case as amended, or (iv) any action asserting a claim governed by the internal affairs doctrine, in each such case subject to such court having personal jurisdiction over the indispensable parties named as defendants therein. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 5.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

74.    Plaintiff purchased his shares prior to the Board's unilateral approval of the forum selection provision and there was no element of mutual assent to the forum choice imposed by the bylaw.   Plaintiff did not consent to the adoption of the bylaw provision and does not concede its validity or enforceability.

75.    MusclePharm is incorporated in the state of Nevada and maintains its headquarters in the state of Colorado.  The misconduct alleged herein emanates from the states of Colorado and Nevada and gives rise to claims under Nevada law.  Upon information and belief, there are no sufficient contacts with the state of New York sufficient to confer jurisdiction over this action pursuant to N.Y. CLS CPLR § 302.

76.    To force shareholders to litigate matters of Nevada law involving a Colorado company and non-resident defendants in a state that has no interest in the outcome of the claims at issue, nor any reasonable connection with MusclePharm is wholly unreasonable, will lead to waste of corporate assets and would likewise cause the waste of substantial judicial resources in New York and unnecessarily burden the courts in that state.

77.    Moreover, the courts of the state of New York lack jurisdiction to hear the claims covered by the forum selection provision, particularly where, as here, the shareholder is a non-resident of New York and none of the exceptions under N.Y. CLS Bus. Corp. § 1314 are applicable.

78.    N.Y. CLS Bus. Corp. § 1314 provides that an action or special proceeding against a foreign corporation may be maintained by another foreign corporation of any type or kind or by a non-resident only where: (1) it is brought to recover damages for the breach of a contract made or to be performed within this state, or relating to property within this state at the time of the making of the contract; (2) the subjection matter of the litigation is situated within this state; (3) the cause of action arose within this state, except where the object of the action or special proceeding is to affect the title of real property situated outside this state; (4) in any case not included in the preceding subparagraphs, a non-domiciliary would be subject to the personal

jurisdiction of the courts of this state under section 302 of the civil practice law and rules; (5) the defendant is a foreign corporation doing business or authorized to do business in this state.

79.     Of interest in this analysis is also N.Y. Gen. Oblig. Law § 5-1402, which sets forth a choice of forum statute allowing any person to maintain an action, notwithstanding N.Y. CLS Bus Corp. § 1314, against a foreign corporation or nonresident where the action arises out of a contract or agreement.

80.     However, in order for a choice of forum to be effective under § 5-1402, the statutory requirements are: (1) there must be an agreement for which a choice of New York law has been made in whole or in part pursuant to § 5-1401; (2) the agreement must involve an obligation arising out of a transaction covering not less than one million dollars, and; (3) the agreement must contain a clause whereby the foreign corporation or nonresident agrees to submit to the jurisdiction of the courts of New York State.  None of these statutory requirements are met here.

81.     Notably, if N.Y. CLS Bus. Corp. § 1314 and N.Y. Gen. Oblig. Law § 5-1401 and 5-1402 are found not to apply, and even if the Court were to determine there was some other basis for jurisdiction, a New York court, in its discretion, could decline to hear the action. Indeed, it is well settled that New York courts are "not required to add to their financial and administrative burdens by entertaining litigation which does not have any connection with this State." *Islamic Republic of Iran v. Pahlavi*, 62 N.Y.2d 474, 478 (N.Y. 1984) (noting that a court may dismiss "where it is determined that the action, although jurisdictionally sound, would be better adjudicated elsewhere" and observing that the court may also consider that both parties to the action are nonresidents and that the transaction out of which the action arose occurred primarily in a foreign jurisdiction); *DDR Real Estate Servs. V. Burnham Pac. Props.*, 769 N.Y.S.2d 832 (N.Y. Sup. Ct. 2003) (dismissing action for lack of subject matter jurisdiction where there was no jurisdiction created under N.Y. CLS Bus. Corp. § 1314, N.Y. Gen. Oblig. Law § 5-1401 or 5-1402 because there was no choice of law provision in the parties' forum

selection agreement sufficient to demonstrate that the parties agreed that the law of New York shall govern the parties' rights and duties); *Hart v. General Motors Corp.*, 129 A.D.2d 179 (N.Y. App. Div. 1st Dep't 1987) (dismissing a shareholder derivative action given the burden on New York courts and the availability of alternative forums in which to bring suit); *Wachsman v. Craftool Co.*, 353 N.Y.S.2d 78 (N.Y. Sup. Ct. 1973) (*sua sponte* invoking the doctrine of forum non-conveniens to dismiss the action between New Jersey litigants and noting that "[t]he [New York] court should not be vexed with litigation between non-resident parties over causes of action, which arose outside of the court's territorial limits, for the sole reason of invoking the forum's [liberal] attachment policies.").

82.     For the reasons set forth herein, the Court should cause the Company to strike the forum selection bylaw provision.

**J.   Shareholder Activist Accuses MusclePharm Management of Entrenchment and Breach of Fiduciary Duty**

83.     On April 30, 2015 filed its annual proxy for MusclePharm's 2015 Annual Meeting of Shareholders, to be held on June 24, 2015.  In the April 30 proxy, shareholders were asked to re-elect all members of the Board, comprised of Defendants Pyatt, Estalella, Doron, McClory, and non-defendants Gregory Macosko ("Macosko") and Andrew Lupo ("Lupo").

84.     However, in an unprecedented move, the Company announced on May 28, 2015 that defendant McClory, Macosko, and Lupo, purportedly the "independent" directors of the Board, had all suddenly mass resigned on May 21, 2015.  With these directors gone, and only defendants Pyatt, Estalella and Doron left on the Board, the Board (comprised of Pyatt, Estalella and Doron) selected defendant Doron as lead director on May 21, 2015, and were able to handpick the purported new "independent" members of the Board by appointing Noel Thompson ("Thompson") and Stacey Jenkins (Jenkins") as directors on May 22, 2015 and appointing William Bush ("Bush") as a director on May 27, 2015.

85.     The Company further announced on May 28, 2015 that it had adjourned the 2015 annual meeting of shareholders originally scheduled for June 24, 2015 and rescheduled the annual meeting to August 26, 2015.

86.     This shocking news did not go unnoticed by shareholders already critical of management and the Company's lack of adequate internal controls and good corporate governance.  In a scathing letter dated June 8, 2015 and addressed to the Board, Wynnefield Capital Management, LLC ("Wynnefield Capital"), one of the Company's largest shareholders, questioned MusclePharm's positive claims about its liquidity, accused the Board of approving improper bylaws that unfairly entrenched management to the detriment of the Company and its shareholders and demanded a full explanation surrounding the mass resignation and replacement of the three purported "independent" directors of the Company, *inter alia*:

June 8, 2015
Bradley J. Pyatt, Chairman of the Board;
Each of the Members of the Board of Directors
MusclePharm Corporation
4721 Ironton Street, Building A
Denver, Colorado 80239


Ladies and Gentlemen:

Wynnefield Capital Management, LLC and its affiliates ("Wynnefield") are longtime and significant shareholders in MusclePharm Corporation (the "Company"). This letter is a follow up to our several earlier communications in which we expressed serious concerns with deficiencies in the Company requiring immediate attention in the areas of liquidity, corporate governance and transparency, and accuracy of disclosure to the public. We have previously attempted in good faith to bring these issues to the attention of management, but our concerns have been largely ignored. We, therefore, believe it is appropriate to write to the entire Board to ensure that the recently appointed independent directors are fully apprised of our most pressing concerns.

**Liquidity**

The Company announced in its first quarter earnings release on May 11, 2015, that its cash flow increased $5.9m – a year over year increase of 282%. CEO Brad Pyatt, commenting on the Company's results, noted how pleased he was with the Company's

27

fundamentals and "the positive momentum we have built in continued revenue contributions, positive cash flow and sustainable margins." He also noted active management of the Company's cash position with strong increases of cash flow during the first quarter of 2015. The Company's May 12, 2015 earnings conference call supported and went beyond these positive statements regarding the Company's cash position and liquidity. CFO John Price noted that "cash flow provided by operations was $682,000 versus a use of cash of $1.9m in Q4 demonstrating improvement in our financial strength and solid position to meet long tern financial obligations." Additionally, President Richard Estalella noted in response to a question about compliance with debt covenants that "we feel that we'll be within all of our covenants by the end of Q2."

There are a number of indicators, however, that strongly suggest that the true picture regarding liquidity may be very different. The First Amendment to the Company's Manufacturing Agreement, dated March 2, 2015, with F.H.G. Corporation, d/b/a "Capstone Nutrition", filed as Exhibit 10.1 and disclosed in Note #4 to the Company's Form 10-Q for the first quarter of 2015, outlines in Section 19.8 of the agreement, payments owed Capstone Nutrition on the 30th, 60th, and 90th day from March 2, 2015, totaling $2.5m. In addition, Note #7 to the Company's Form 10-Q for the first quarter of 2015 discloses that, as of March 31, 2015, the Company had drawn down all $8m under its line of credit, putting the Company out of compliance with certain financial covenants, including requiring the line of credit balance to be at or below $3m for a minimum of 14 non-consecutive days per quarter, and requiring a written waiver from the bank, which the Company received that is effective until May 31, 2015 (no subsequent disclosure has been made regarding the status of the waiver after May 31, 2015). Yet despite these circumstances, the Company reported that, as of March 31, 2015, liquidity increased $3.7m to $4.7m, leaving us to conclude that the increase came entirely from a one time inventory drawdown of $7.2m, and not Brad Pyatt's claims of "positive momentum … in continued revenue contribution, positive cash flow and sustainable margins."

**Corporate Governance**

We are increasingly troubled by the Company's May 8, 2015 amendments to its By-laws, summarized below, because of both the new hurdles and burdens they place on shareholder suffrage; especially when considered in light of the Company's recent erratic corporate governance events. The By-laws were amended, i) to require that shareholders of the Company requesting a special meeting provide, in their request to the Company, certain specified information and set forth other requirements regarding delivery of such request; ii) to require that shareholders intending to act by written consent request a record date from the Company for such action, which request must include certain specified information and set forth other requirements regarding the delivery of written consents; iii) to require certain shareholder disclosure requirements regarding advance notice of shareholder proposals and shareholder nominations; iv) to provide that only the Board can fill vacancies of the Board; v) to provide that directors may be removed by a two-thirds (as opposed to majority) vote of the shareholders, as contemplated by NRS 78.335; and vi) to provide that that any person acquiring equity in the Company shall be

deemed to have notice of and consented to Article VII, Section 5 of the By-laws, relating to choice of forum where to bring disputes.

We believe these provisions, which are viewed with disfavor by ISS, are nothing more than a thinly veiled attempt to entrench management and diminish their accountability to the shareholders of the Company.

The By-law changes are especially problematic when viewed in the context of the Company's machinations regarding the composition of its Board of Directors. The Company's first quarter earnings release states a present intention to increase the size of the Board to seven which was confirmed by Brad Pyatt during the May 12, 2015 earnings conference call. These statements, made *after* the Company had filed its proxy statement for the upcoming annual meeting of shareholders, seemed to demonstrate an intent to avoid a shareholder election to fill the newly created board seat and therefore thwart the shareholders' primary method of board accountability. By not including the seventh director in the proxy statement to be voted on by the shareholders, the Board is empowered to appoint a candidate of its choosing to fill the new board seat after the annual meeting, further entrenching an already captive and acquiescent board.

The Company's May 28, 2015 announcement of the en masse and management orchestrated resignation and replacement of the three independent members of the Board and the postponement of the annual meeting of shareholders until August 26, 2015, has further undermined shareholder confidence in the Company's corporate governance controls and begs further explanation and disclosure. However, despite these major changes to the composition of the Board, the delay of the annual meeting, and the fixing of a new record date for shareholders, the Company continues to deny shareholders their basic democratic rights by attempting to procedurally deny the fundamental right of shareholders to submit nominees for election at the upcoming annual meeting. The newly amended Section 9 of Article II of the Company's By-laws states that a public announcement of postponement or adjournment of the annual meeting does not reopen the advance notice of director nominee window. This is a very convenient result for the Company's Board. Nevada corporate law, however, is clear that this transparent and highly orchestrated attempt to deny shareholder democracy will not succeed in depriving the shareholders of their ability to submit nominees for election to the Board. There is strong authority that challenges by-law advance notice provisions when there is a material change of circumstances occurring after the advance notice deadline. Nevada corporate law preserves the paramount importance of shareholder voting rights and requires a board to act to protect shareholder suffrage rights, including the ability to nominate candidates for election. Certainly the wholesale, simultaneous resignation and replacement of the Company's independent directors constitutes such a material change requiring the Board to act and waive the advance notice provision of the Company's By-laws.

We believe the fiduciary duties of the Company's directors require the Board to take immediate action to address these issues and call upon the Board to take the following action:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1)Issue an immediate press release correcting any material misstatements regarding the Company's current liquidity and cash flow position.

2)Announce the opening of a window for shareholder submission of nominees for election to the Company's Board, including nominees to fill the newly created seventh board seat, in accordance with Nevada corporate law.

3)Provide a full explanation surrounding the mass resignation and replacement of the three independent directors of the Company.

4)Engage a qualified investment bank to assist management and the Board to fully explore all strategic opportunities to increase shareholder value, including auction of the Company.

We trust that you will accept our recommendations and incorporate them promptly to avoid further action by us. We request that you publically announce the steps that you are taking in response to this letter by June 19, 2015.

Very truly yours,
Wynnefield Capital Management, LLC

87.     The "new" Board failed to respond to Wynnefield Capital's concerns, resulting in Wynnefield Capital selling a significant portion of its MusclePharm shares.   Specifically, Wynnefield Capital sold close to 40% of its MusclePharm shares.   As a result, Wynnefield Capital now owns 4.7% of the Company - down from its original 7.7% stake.

## DAMAGES TO MUSCLEPHARM

88.     Due to the Individual Defendants' breaches of fiduciary duty, the Company has had to, and continues to, expend money for its internal investigation, the SEC investigation, and the settlement of the SEC case, including the payment of the $700,000 penalty and the costs of hiring an independent monitor.

89.     As a direct and proximate result of the Individual Defendants' conduct, MusclePharm has suffered and will continue to suffer a loss of reputation and goodwill, and a significant decrease in the Company's market capitalization.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

90.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

91.     Plaintiff brings this action derivatively in its right and for the benefit of MusclePharm to redress injuries suffered, and to be suffered, by MusclePharm as a direct result of the breaches of fiduciary duties by the Individual Defendants.  MusclePharm is named as a nominal defendant in this case solely in a derivative capacity.

92.     As alleged above, Plaintiff is currently a MusclePharm stockholder.  Plaintiff also was a MusclePharm stockholder at the time of the breaches of fiduciary duties complained of herein.  Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in prosecuting this action.  Because a majority of the Board either faces a substantial likelihood of liability for the acts and omissions complained of herein or lack independence and disinterestedness, prosecution of this action, independent of the current Board, is in the best interests of the Company and its shareholders.

93.     The wrongful acts complained of herein subjected, and continue to subject, MusclePharm to harm.

94.     The Board is currently comprised of the following seven individuals:  Defendants Pyatt, Estalella, Doron and non-defendants Ryan Drexler ("Drexler"), William Bush, Jenkins and Thompson.  Plaintiff did not make a demand upon the Board prior to instituting this action because a majority of the Company's directors either:  (1) lack independence; (2) engaged in (or consciously disregarded) conduct that was not a legitimate exercise of business judgment and/or was *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule; and/or (3) are interested and therefore conflicted from and unable to fairly consider a demand because they face a substantial likelihood of liability for their failure to exercise their fiduciary duties of oversight in good faith.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

95.     Defendant Pyatt, as the Company's founder and CEO, and Defendant Estalella, as the Company's President are non-independent directors.  As noted in the DEF 14A filed by the Company on July 8, 2015 (the "2015 Proxy Statement"), neither of defendants Pyatt or Estalella qualify as independent under applicable NASDAQ rules.  For this reason, demand upon them is futile, and thus excused.

96.     Demand is futile as to defendants Pyatt and Estalella for the additional reason that, as MusclePharm's CEO and President, respectively, defendants Pyatt and Estalella are employees of the Company who derive substantially all of their income from their employment with MusclePharm, making them not independent.  Specifically, in 2014, the Company paid defendants Pyatt and Estalella $7,118,439 and $3,827,468, respectively.  In 2013, they were paid $4,462,542 and $1,546,763, respectively.  As such, Defendants Pyatt and Estalella cannot independently consider any demand to sue themselves for breaching their fiduciary duties to MusclePharm, because that would expose them to liability and threaten their livelihoods.

97.     Along those same lines, demand is further futile as to Pyatt and Estalella because in their principal professional occupations as MusclePharm's CEO and President, respectively, they stand to earn millions of dollars as explained above, all of which must be approved by the Company's current Compensation Committee, of which defendant Doron is a member and Chairman, and therefore Pyatt and Estalella lack independence from defendant Doron.

98.     In addition, defendant Pyatt was specifically found by the SEC to be complicit in the wrongdoing outlined above.  As such, defendant Pyatt faces a substantial likelihood of liability.  If defendant Pyatt were to bring a suit on behalf of MusclePharm to recover damages sustained as a result of this misconduct, he would expose himself to significant liability.  This is something he will not do.  For this reason demand on defendant Pyatt is futile.

99.     Likewise, demand on defendants Estalella and Doron is futile as the both face a substantial likelihood of liability.  Both defendants Estalella and Doron oversaw the wrongdoing complained of herein.  Specifically, defendant Estalella was the Company's COO from April

32

2013 through April 2014.   During that time period, MusclePharm continued, at the direction of defendants Pyatt, Estalella, Doron, Gregory, Prosser, Davis, and McClory to cause the Company to make false and misleading filings with the SEC.   Moreover, defendant Doron was not only a member of the Board during the time of the wrongdoing, but sat on the Compensation Committee and Audit Committee, while simultaneously chairing the Nominating and Corporate Governance Committee.   As a member of each of these committees, defendant Doron would have had complete and unique access to the wrongdoing outlined herein, yet made no effort to prevent or stop the wrongdoing.   In fact, it was the Board's Audit Committee, which included defendant Doron, which undertook the internal investigation of the complained of matters, and time after time failed to truthfully report the entirety of the executive compensation prerequisites in question as confirmed by the SEC's investigation.   For these reasons, demand on defendants Estalella and Doron is futile.

100.   Demand on Chairman of the Board Drexler would also be futile.   Drexler is an experienced investor and manages Consac, LLC ("Consac").   Consac, which invests in publicly traded and venture companies in the health and wellness space, has made significant investments in MusclePharm's stock in the public market and in private transactions. It is no coincidence that Drexler became MusclePharm's Chairman in June 2015.   In May 2015, Consac took a 7.4% stake in MusclePharm, making Consac currently the Company's largest shareholder.   Consac, led by Drexler, has a history of taking positions in companies and then calling for their sale as a way of leveraging its positions for a quick profit.[3]   There is no doubt that Drexler would not

[3] See Ryan Drexler of Consac Calls Again for Quiksilver Management to Explore Options to Sell the Company, Sees Value to Strategic Buyer in Store Network and Cost Savings; http://www.prnewswire.com/news-releases/ryan-drexler-of-consac-calls-again-for-quiksilver-management-to-explore-options-to-sell-the-company-sees-value-to-strategic-buyer-in-store-network-and-cost-savings-300070563.html. Vitacost.com Urged to Sell Itself by Activist Investor Consac; http://www.bloomberg.com/news/articles/2014-02-20/vitacost-com-urged-to-sell-itself-by-activist-investor-consac. Consac calls for Bebe Stores Chairman Manny Mashouf and Board to sell or take retailer private; http://www.marketwatch.com/story/consac-calls-for-bebe-stores-chairman-manny-mashouf-and-board-to-sell-or-take-retailer-private-2014-08-18.

33

disinterestedly consider a demand given Consac's investment history and bringing a case to hold the Individual Defendants responsible with their wrongdoing would conflict with his personal agenda in connection with MusclePharm.

101.   Likewise, making a demand on Thompson would be futile.  Thompson is a national wrestling treasure, having had successful high school and collegiate careers.  Thompson served as the USA Women's Wrestling Team Leader at the 2013 World Championships in Budapest, Hungary, and is on the Women's Team USA leadership staff throughout the four-year Olympic cycle.  As noted in Team USA's press release announcing Thompson's selection as the 2013 Team Leader, "Thompson has been a leader within international wrestling for many years, and has helped promote and expand the sport in the United States at many levels."  The release went on to chronicle Thompson's accomplishments and involvement in the wrestling world:

> Thompson serves on the Board of Trustees for the Beat the Streets program in New York City, whose mission is "to develop the full human and athletic potential of the urban youth and to strengthen the culture of New York City wrestling." Thousands of young people in the city have been provided the opportunity to wrestle through this amazing program.
>
> He has served as the Master of Ceremonies for the last three Beat the Street Gala events in New York City. In 2000, the event featured an all-star challenge event which was held on the U.S.S. Intrepid aircraft carrier in New York Harbor. In 2011, the event featured a USA vs. Russia dual meet in Times Square, the first sports event ever held in this historic location. In 2012, the USA vs. Russia meet returned to Times Square, along with a 60 kg Special Wrestle-off for the U.S. Olympic Team.
>
> Thompson served three years as the Wrestling Chairman for the New York Athletic Club, one of the world's most successful wrestling clubs on the Olympic level. Prior to that, he served three years as the president of the wrestling club there.
>
> While serving as the NYAC Chairman, the club won four USA Wrestling national team titles, two in men's freestyle and two in women's freestyle. In 2010, the NYAC men's freestyle team won the U.S. Open, snapping the Sunkist Kids streak of consecutive national titles of more than two decades. Two members of the New

York Athletic Club, men's freestyler Jake Herbert and women's freestyler Adeline Gray, won World medals for the United States under Thompson's leadership.

He is a member of the Board of Governors of the National Wrestling Hall of Fame, and has served on its Outstanding American selection committee for two years.

Thompson is the leader of the organizing committee for the Grapple at the Garden, a major college dual meet event which was held in world-famous Madison Square Garden in 2012. It was the first college wrestling event held in this historic location. There were 14 Div. I teams in the event, including eight teams ranked in the top 25. Five past NCAA champion athletes and numerous All-Americans were also showcased. Plans are to continue this event in the future.

He also has served on the Board of Hofstra University Athletics since 2006. Thompson was a top wrestling star at Hofstra, a four-time NCAA qualifier and two-time conference champion. Three times, he reached the round of 12 at the NCAA Championships. Also during his competitive career, he was an All-American at the 2001 U.S. Open in men's freestyle. Thompson graduated with a bachelor's degree in business administration with a minor in Eastern history from Hofstra.

Thompson competed for Freeport High School on Long Island, where he was an undefeated state champion in 1998. He earned All-American honors at the USA Wrestling Junior Nationals, and was also a folkstyle national All-American.

102.    Needless to say, Thompson is about as dedicated to the sport of wrestling as one can be, but therein lies the problem.  MusclePharm became USA Wrestling's exclusive official nutritional supplement provider in March 2014.  As noted by defendant Pyatt at the time "[w]e are fully committed to helping USA Wrestling's athletes on their road to success, as they progress through their training leading up to the 2015 World Wrestling Championships and the 2016 Olympic Games in Rio and beyond."  He went on to say "[w]e are pleased to partner with USA Wrestling and to help develop the next generation of athletes at a time when wrestling is experiencing a renaissance in popularity."  From that moment on, Thompson has carried the MusclePharm flag, as demonstrated by his Instagram and Facebook accounts which repeatedly tout MusclePharm.  It is inconceivable that Thompson would independently and disinterestedly consider a demand to sue Defendants Pyatt and Gregory when they have been so supportive in

1   connection with the USA wrestling movement.  Accordingly, any demand on Thompson would

2   be futile.

3        103.   Lastly, demand is futile as to Jenkins, Thompson and Bush as their suspiciously

4   timed appointment to the Board following the mass resignation of the Company's former

5   directors raises serious concerns regarding whether these directors are puppets of Company

6   management, namely defendants Pyatt and Estalella, who handpicked them.   Indeed, as

7   described in its letter described above, Wynnefield Capital accused management of entrenchment

8   and described the current Board, of which Jenkins, Thompson and Bush are members, as "an

9   already captive and acquiescent board."  Accordingly, there is a reasonable doubt that Jenkins,

10  Thompson and Bush are able to independently consider a demand against management,

11  specifically defendants Pyatt and Estalella.

12                                  **COUNT I**

13             **Against the Individual Defendants for Breach of Fiduciary Duties**

14        104.   Plaintiff incorporates by reference and re-alleges each and every allegation set

15  forth above, as though fully set forth herein.

16        105.   The Individual Defendants each owed MusclePharm and its shareholders the

17  fiduciary duties of loyalty, good faith, and due care in managing and administering the

18  Company's affairs.

19        106.   The Individual Defendants were required to exercise reasonable and prudent

20  supervision over the management, practices, controls, and financial affairs of MusclePharm.

21        107.   The Individual Defendants breached their fiduciary duties owed to MusclePharm

22  and its shareholders by willfully, recklessly, and/or intentionally failing to perform their

23  fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend

24  corporate funds.  They also failed to properly oversee MusclePharm's business, rendering them

25  personally liable to the Company.

26

27
28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

108.   In breach of their fiduciary duties owed to MusclePharm, the Individual Defendants willfully participated in the misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements, and failed to implement and/or properly oversee adequate business and internal controls, rendering them personally liable to the Company for breaching their fiduciary duties.

109.   The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations and executive compensation and failed to correct the Company's false and misleading public statements.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

110.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

111.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of loyalty, good faith, and due care, as alleged herein, MusclePharm has sustained, and continues to sustain, significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### Against the Defendants Pyatt, Estalella and Doron for Breach of Fiduciary Duties

112.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

113.   The power of the directors to amend bylaws is subject to their fiduciary duty to the stockholders and to the Company.

114.   The bylaw was adopted unilaterally by the self-interested directors with no stockholder vote.

37

115.    Where directors have a self-interest in a bylaw amendment or did not adequately inform themselves before adopting the amendment, the entire fairness standard is applicable.

116.    Defendants Pyatt, Estalella and Doron have a material interest in the bylaw because it enables them to cause litigation against them to be confined to the forum where they believe they are least likely to be held liable and may make it difficult or impossible for certain claims to be brought against them.

117.    The limited disclosure of the bylaw provides no information as to the reasons for and effects of a bylaw designating a forum that is neither related to the Company's state of incorporation, the location of its headquarters, nor any transaction at issue.

118.    As discussed above, the bylaw will unduly burden courts in the state of New York, cause unnecessary corporate waste to the detriment of MusclePharm and will have numerous negative effects on Plaintiff and the Company's other stockholders.

119.    For these reasons, the bylaw is invalid and unenforceable.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of MusclePharm and that Plaintiff is a proper and adequate representative of the Company;

B.    Declaring that the exclusive forum selection bylaw is invalid and unenforceable;

C.    Interpreting the bylaw and the scope of its applicability;

D.    Preliminarily and permanently enjoining the Company and its Board of Directors from enforcing the bylaw;

E.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

F.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to, corporate

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

governance changes to ensure the Company maintains proper internal controls and SEC reporting procedures;

G.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

DATED: October 27, 2015                         Respectfully submitted,

                                                MUCKLEROY LUNT, LLC


                                                MARTIN A. MUCKLEROY, ESQ.
                                                Nevada Bar No. 009634
                                                BRIAN E. LUNT, ESQ.
                                                Nevada Bar No. 011189
                                                6077 S. Fort Apache, Ste. 140
                                                Las Vegas, NV 89148
                                                Phone: (702) 907-0097
                                                Direct: (702) 534-6272
                                                Fax: (702) 938-4065
                                                martin@muckleroylunt.com
                                                brian@muckleroylunt.com

                                                *Liaison Counsel for Plaintiff*

                                                HYNES KELLER & HERNANDEZ, LLC
                                                Michael J. Hynes
                                                Ligaya T. Hernandez
                                                1150 First Avenue, Suite 501
                                                King of Prussia, PA  19406
                                                Telephone:  610-994-0292
                                                Facsimile:  914-752-3041

                                                *Counsel for Plaintiff*

                                                39
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Brian D. Gartner, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint; that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: 10/9/15

Brian D. Gartner